## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE


Frank Staples

     v.                                  Civil No. 14-cv-473-JL

Richard M. Gerry, Warden, New Hampshire
State Prison; William Wrenn, Commissioner,
New Hampshire Department of Corrections;
New Hampshire Parole Board; and James Daly,
Chaplain, New Hampshire State Prison


### REPORT AND RECOMMENDATION

Before the court is New Hampshire State Prison ("NHSP")
inmate Frank Staples's "Motion for Urgent Hearing on Major Human
Rights Violations Religious Rights" (doc. no. 1).  The motion,
in pertinent part, seeks preliminary injunctive relief relating
to restrictions imposed upon Staples by defendants, arising from
his refusal to shave the full length beard he has grown as a
religious practice.  Staples seeks a preliminary injunction,
directing the NHSP to: reduce Staples's heightened security
classification, downgrade his housing placement from maximum to
medium security, and exempt him from the prison policy that
subjects him to the risk of disciplinary sanctions, for refusing
to trim his beard to a ¼ inch or less.  Staples also seeks
court-ordered parole.  The motion has been referred to the
magistrate judge for a recommendation as to disposition, under
28 U.S.C. § 636(b)(1)(B).  See Nov. 21, 2014, Order.

For reasons set forth below, the district judge should grant the motion for a preliminary injunction (doc. no. 1), in part, by issuing the order proposed in the conclusion of this Report and Recommendation, which removes the beard-related restrictions placed upon Staples by defendants.  The remaining relief requested in the motion (doc. no. 1) should be denied, including the request for court-ordered parole.

## Background

For purposes of the preliminary injunction motion, the following facts are undisputed.  The NHSP has a policy that requires all inmates with beards to trim them to ¼ inch or less. See Doc. No. 65; Defs.' Ex. D for Feb. 19, 2015, Evidentiary Hearing (N.H. Dep't of Corrs. ("DOC") Manual for Guidance of Inmates (2011 ed.)).  The NHSP policy does not make any exception for inmates seeking to grow or maintain a longer beard, because of their religious beliefs.  See Doc. No. 65. The beard length policy is generally enforced in all NHSP housing units, except in the maximum security Special Housing Unit ("SHU").  SHU inmates are generally allowed to grow beards, but the NHSP requires inmates to shave at the time of their transfer from SHU to any lower security unit.  See Testimony of NHSP Warden Richard Gerry (Feb. 20, 2015) (policy applies in all

units); Testimony of NHSP Capt. Ronald Gagliardi (Feb. 19, 2015) (SHU inmates are allowed to grow long beards, but must shave upon transfer).

Staples, a practicing Taoist, is a SHU inmate who has a full-length beard, which he refuses to trim as a Taoist practice.  See Doc. No. 65.  Staples's beard has been growing for several years without being trimmed, and is presently many inches longer than the ¼ inch beard length authorized by NHSP policy.  See id.; see also Defs.' Ex. A for Feb. 19, 2015, Evidentiary Hearing.  Prison officials will neither reduce Staples's security classification to "C-3" (medium security), nor transfer Staples from SHU to the "C-4" Close Custody Unit ("CCU") or to any lower security unit, unless Staples shaves or trims his beard in compliance with the beard length policy.  See Doc. No. 65.

The New Hampshire Adult Parole Board ("APB") held a hearing on April 3, 2014, to consider whether to parole Staples to the community from his current sentence for a bail jumping conviction, the second of two consecutive sentences Staples was sentenced to serve at the NHSP.  The April 3, 2014, hearing began with APB members questioning Staples about his elevated (C-4) classification.  See Defs.' Ex. M for Feb. 19, 2015, Evidentiary Hearing (Recording of Apr. 3, 2014, APB Hearing).

Staples replied that prison officials would not lower his classification because he had refused to shave his beard for religious reasons.  See id.  After the panel asked additional questions about Staples's beard, religion, and classification, the APB denied parole on that date, citing Staples's elevated classification as a reason.  See id.; Doc. No. 65; Defs.' Ex. L for Feb. 19, 2015, Evidentiary Hearing (hearing minutes); Testimony of Ashlyn St. Germain (Feb. 19, 2015) (reasons for denial).  The APB further stated on April 3, 2014, that the APB would consider Staples for parole again only if he was "C-3" and had a "solid" parole/residence plan.  See Testimony of Ashlyn St. Germain; Defs.' Ex. L (minutes); Defs.' Ex. M for Feb. 19, 2015, Evidentiary Hearing (Apr. 3, 2014, recording).

Staples filed this action in 2014 against the APB and agents of the New Hampshire Department of Corrections, asserting violations of his religious rights and illegal discrimination, relating to his full length beard.  See Doc. No. 1.  The relevant claims at issue in Staples's motion for preliminary injunction are summarized below:

1.   Defendants Wrenn, Gerry, and the APB, have violated Staples's rights under: (a.) the Religious Land Use and Institutionalized Persons Act, 42 U.S.C § 2000cc-1 ("RLUIPA"); and (b.) the First Amendment Free Exercise Clause; by:

        i.   Refusing to grant Staples a religious exemption from the beard length policy and subjecting him to

4

disciplinary proceedings, unless he shaves his beard,

ii.  Housing Staples in SHU and prohibiting him from moving to any less restrictive housing unit at NHSP, unless he shaves his beard,

iii. Refusing to lower Staples's security classification to C-3, unless he shaves his beard, and

iv.  Denying Staples parole because of his elevated security classification, and conditioning future parole consideration on Staples's obtaining C-3 security status, which the NHSP will not grant unless Staples shaves his beard.

2.  Defendants Wrenn, Gerry, and the APB have violated Staples's rights under the Fourteenth Amendment Equal Protection Clause, by discriminating against Staples in connection with disciplinary proceedings, his security classification, housing placement, and application for parole, based on his practice of maintaining an untrimmed beard, as an exercise of his Taoist religious faith.

The parties appeared before the undersigned magistrate judge for an evidentiary hearing on plaintiff's preliminary injunction motion on February 19-20, 2015.  The record before this court, including the parties' affidavits, filings, and the evidence admitted at the hearing, sheds light on each of the claims set forth above.  The court generally limited the scope of the hearing, however, to evidence relevant to the RLUIPA and Free Exercise claims, and to factors relevant to the motion for a preliminary injunction.

The court, at this time, declines to issue an opinion on Staples's First Amendment claims in the context of ruling on Staples's motion for a preliminary injunction.  To do so would

be essentially advisory.  Because RLUIPA is more protective of an inmate's religious practices than the First Amendment, <u>see Bader v. Wrenn</u>, 675 F.3d 95, 98 (1st Cir. 2012), Staples could show a likelihood of success on the merits of a RLUIPA claim without showing a likelihood of success on any related First Amendment claim.  The relief available to redress violations of those related religious exercise claims would likely be the same.  For those reasons, this Report and Recommendation focuses first on Staples's RLUIPA claims, and then addresses his equal protection claims, but does not express any opinion or recommended ruling regarding the merits of Staples's First Amendment claims.

## Discussion

### I.   Preliminary Injunction Standard

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." <u>Winter v. Natural Res. Def. Council, Inc.</u>, 555 U.S. 7, 20 (2008).  The likelihood of success on the merits and irreparable harm weigh heavily in the analysis, and are assessed in relation to one another.  <u>See</u>

W Holding Co. v. AIG Ins. Co., 748 F.3d 377, 383 (1st Cir. 2014); Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011); Braintree Labs., Inc. v. Citigroup Global Mkts. Inc., 622 F.3d 36, 42-43 (1st Cir. 2010). "'[W]hen the likelihood of success on the merits is great, a movant can show somewhat less in the way of irreparable harm and still garner preliminary injunctive relief." Vaqueria Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 485 (1st Cir. 2009) (citation omitted).  The burden of proof on all four preliminary injunction factors is on the movant.  See Esso Std. Oil Co. v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006).  The Prison Litigation Reform Act ("PLRA") further requires that any injunctive relief imposed in this case be both narrowly drawn and the least intrusive means necessary to correct the harm. See 18 U.S.C. § 3626(a)(2).

## II.  **Likelihood of Success on Merits**

There at two types of restrictions at issue:  NHSP restrictions, and APB conditions.  This court assesses Staples's likelihood of success on the merits by turning first to the RLUIPA claims challenging the NHSP restrictions.[1]

---

[1]Staples is not the first inmate to assert a RLUIPA challenge to the NHSP beard length policy.  In Kuperman v. Wrenn, No. 08-cv-513-SM, 2010 DNH 153, 2010 U.S. Dist. LEXIS 89712, 2010 WL 3418398 (D.N.H. Aug. 27, 2010), aff'd, 645 F.3d 69 (1st Cir. 2011), the inmate (Kuperman) claimed that the NHSP

A.    RLUIPA Claims as to NHSP Restrictions

    1.    Liability Standard

RLUIPA provides, in pertinent part:

> No government shall impose a substantial burden on the
> religious exercise of a person residing in or confined to
> an institution, . . . even if the burden results from a
> rule of general applicability, unless the government
> demonstrates that imposition of the burden on that person—
>
> > (1) is in furtherance of a compelling governmental
> > interest; and
> >
> > (2) is the least restrictive means of furthering that
> > compelling governmental interest.

42 U.S.C. § 2000cc-1(a).  RLUIPA provides a cause of action for

---

violated RLUIPA by preventing him from growing a full length
beard for religious reasons.  The district court granted
defendants' motion for summary judgment because Kuperman had not
produced evidence to counter defendants' affidavits, and thus
had not raised a triable issue, as to whether the beard
limitation was the least restrictive means of achieving the
prison's compelling security objectives.  Id., 2010 U.S. Dist.
LEXIS 89712, at *12.  The First Circuit affirmed.  See 645 F.3d
at 80.  While the justifications for the NHSP beard length
policy offered in this case are essentially the same as those
offered and unrebutted in Kuperman, rebuttal evidence lacking in
that case is before the court here.  The Supreme Court made it
clear in Holt v. Hobbs, 135 S. Ct. 853, 190 L. Ed. 2d 747 (2015)
(holding that Arkansas prison regulation violated RLUIPA by
preventing inmate Holt from growing ½-inch beard in accordance
with his religious beliefs), that a court must scrutinize prison
officials' justifications in light of the case-specific
evidence, in evaluating the RLUIPA claims in a particular case.
See id., 135 S. Ct. at 863-64.  Staples's circumstances are not
identical to Kuperman's, and those differences, evaluated in
light of Holt, explain why Kuperman does not dictate the outcome
of Staples's preliminary injunction motion.

violations of § 2000cc-1(a).  See id. § 2000cc-2(a).

### 2.   Substantial Burden on Religious Exercise

A prisoner, seeking to establish governmental liability under RLUIPA must prove that there is a sincere religious basis for the practice alleged to be burdened by the government, and that the burden at issue is "substantial."  See Holt v. Hobbs, 135 S. Ct. 853, 862, 190 L. Ed. 2d 747 (2015).  Counsel for defendants stipulated to these issues, see Doc. No. 65, for purposes of the preliminary injunction hearing.  On the record during the February 19, 2015, hearing, defendants' counsel further specifically declined to dispute at this time that (i.) by subjecting Staples to discipline for violating the beard length policy, (ii.) by heightening Staples's security classification above a C-3 level, and (iii.) by causing Staples to remain confined in maximum security in SHU, unless he trims his beard, the NHSP has substantially burdened Staples's religious exercise.

### 3.   NHSP Justifications for Restrictions

In light of the parties' stipulations, the burden shifted to defendants to show that Staples's classification, housing placement, and the threat of disciplinary consequences arising from his refusal to shave, constituted the "least restrictive means" of "furthering" a "compelling" governmental interest.

See Holt, 135 S. Ct. at 863; see also 42 U.S.C. § 2000cc-1(a).
RLUIPA requires a case-specific focus on the restrictions that
prevent Staples from growing a full length beard outside SHU.
See Holt, 135 S. Ct. at 863-64.

### a.   Heightened Classification

Defendants have stipulated for the purposes of the
preliminary injunction motion that Staples's heightened
classification imposes a substantial burden on his growth of a
beard as a religious practice.  RLUIPA therefore requires
defendants to show that the elevated classification restriction,
in context, is the least restrictive means available to secure
their objectives.  This, they have failed to do.

The "least restrictive means" test under RLUIPA requires
the government to show that it "'lacks other means of achieving
its desired goal without imposing a substantial burden on the
exercise of religion.'"  Id. at 864 (citation omitted).  If
defendants' restrictions are shown to be under-inclusive with
respect to other types of analogous, nonreligious conduct, or if
other similar facilities allow the religious practices at issue,
and defendants do not "offer persuasive reasons" for having
taken a more restrictive approach to the religious practice at
issue, the court may infer that there are less restrictive means
available that have not been considered.  Id. at 866 (RLUIPA

violation found in part because of (1) Arkansas's failure to show why it cannot allow plaintiff's ½ inch beard, while majority of prisons run by states and federal government would allow such beards, and (2) Arkansas's failure to explain why ¼ inch beards are allowed for medical reasons, and inmates are not otherwise required to go about "bald, barefoot, or naked," to achieve state's asserted interests in regulating beard length).

The evidence in this case shows that an available, less restrictive alternative to keeping Staples in SHU in a heightened classification exists, namely, housing him in SHU in a lower security classification.  The evidence is undisputed that inmates who are classified as C-4 or C-3 may be housed at times in SHU, confirming that it is practicable to divorce an inmate's classification from the housing unit's maximum security designation.  See Testimony of Ronald Gagliardi (Feb. 19, 2015) (SHU inmates may be C-3); Testimony of Staples (Feb. 20, 2015) (SHU inmates may be C-3 or C-4).  The officer in charge of SHU and CCU, Capt. Ronald Gagliardi, testified that with the exception of a few N-Tier "tier workers," who are allowed to move about SHU without handcuffs, essentially all inmates in SHU are treated the same way, regardless of their security classifications.  Inmates classified as C-3, C-4, and C-5 in SHU are subject to similar staff-to-inmate ratios, cell confinement

rules, program restrictions, "single-movement" inmate transport
procedures, and handcuffing requirements.  Testimony of Ronald
Gagliardi (Feb. 19, 2015).  Gagliardi, his supervisors Warden
Richard Gerry and NHSP Chief of Security Maj. Jon Fouts, and
Classifications Administrator Kim Lacasse each testified that
inmates classified as C-3 may be housed in SHU for reasons
including protective custody concerns and lack of bed space in
other units.  Id.; Testimony of Gerry (Feb. 20, 2015); Testimony
of Fouts (Feb. 20, 2015); Testimony of Lacasse (Feb. 19, 2015)
(although SHU is not typically used for housing C-3 inmates, it
has been used to house: C-3 inmates in protective custody when
there is overflow from the Reception and Diagnostic unit, "PAR"
status inmates who may be C-3 (pending administrative review for
an upgrade), and inmates who have been recently released from
punitive segregation who may be C-3).  Evidence presented to
this court shows that Staples has been housed in SHU while
temporarily downgraded to a C-4 or C-3 inmate, until his refusal
to shave or other issues caused prison officials to upgrade his
classification.  See, e.g., Doc. No. 65; Doc. No. 79, at 4.

When asked whether there were concerns arising from keeping
Staples in SHU at a lower classification level, Major Fouts
testified on February 20, 2015, that the institutional safety
and security concerns were mitigated by the heightened security

12

procedures in SHU.  Fouts further testified that the problem
with keeping Staples in SHU was that he was taking up valuable
bed space, and was making it difficult for the prison to deal
with an inmate overpopulation problem, where there are only
ninety-six beds in SHU.  The court notes that RLUIPA may require
prisons to incur costs to avoid substantially burdening an
inmate's religious practices.  See Holt, 135 S. Ct. at 860
(citing 42 U.S.C. § 2000cc-3(c)).  Fouts's testimony, in that
regard, did not persuade the court that the management problems
involved in keeping Staples in SHU are different than those that
arise whenever C-3 inmates are kept in SHU.  Defendants did not
offer any persuasive reasons for allowing some inmates to retain
lower custody levels or classifications despite their placement
in SHU, while Staples's classification must remain elevated in
SHU, unless he shaves.  Accordingly, with respect to Staples's
elevated classification level, Staples has demonstrated a
substantial likelihood of prevailing on the merits of his RLUIPA
claim, insofar as keeping him in an elevated classification
while housing him in SHU, in whole or in part because he refuses
to shave his beard, substantially burdens his religious exercise
in a manner that has not been shown to be the least restrictive
means of furthering a compelling governmental interest.

13

b.   SHU Housing

As applied, the beard length policy prevents Staples from maintaining a beard for religious reasons unless he is kept in SHU.  See Doc. No. 65.  While disciplinary reasons unrelated to Staples's religious practices have, at times, caused or contributed to his SHU confinement over time, it is undisputed that Staples's continuing confinement in SHU relates to his refusal to shave his beard, and that his persistent SHU placement substantially burdens his religious exercise of growing a full length beard.  See id.; see also Doc. No. 26-1 (Fouts Affidavit, Jan. 9, 2014).

Fouts testified on February 20, 2015, that there are four interests furthered by uniform application of the beard length policy in all units but SHU[2]:  (1) the policy facilitates quick and reliable inmate identification, to minimize opportunities for disguises that might enable inmates to have access to restricted areas within the prison or to elude recapture after escaping; (2) the policy prevents inmates from hiding contraband in their beards; (3) the policy inhibits prison gang displays;

---

[2]An additional policy interest was asserted in Fouts's affidavit: namely, an interest in inmate hygiene.  See Doc. No. 11-2, at 2 (Fouts Affidavit, Dec. 5, 2014).  Defendants have not provided sufficient evidentiary support for this court to conclude that hygiene is a compelling interest furthered by any restriction at issue in this case.

and (4) confinement to SHU for a full-bearded inmate like
Staples, in lieu of allowing him to have a beard in the general
population, protects that inmate from abuse by other inmates,
who are not allowed to have beards in a medium security unit.
See Testimony of Fouts (Feb. 20, 2015) (discussing reasons for
policy, and for not exempting Staples); See Doc. No. 11-2 (Fouts
Affidavit, Dec. 5, 2014) (listing reasons for policy).

There is evidence suggesting that making Staples shave as a
condition of his transfer out of SHU is not the least
restrictive means available for furthering any of those
interests.  In particular, Staples testified on February 20,
2015, that county jails in New Hampshire do not limit inmate
beard length.  No evidence has been offered to contradict
Staples's testimony in that regard, and this court, noting
Staples's history of incarceration in the Merrimack County House
of Corrections, finds that Staples's testimony regarding that
facility is not patently unfounded.  Furthermore, this court's
review of pertinent authorities indicates that a number of other
state and federal facilities do not categorically restrict
inmate beard length, in the same manner as the NHSP.  See
Gartrell v. Ashcroft, 191 F. Supp. 2d 23, 27 (D.D.C. 2002)
(Federal Bureau of Prisons "does not impose a grooming policy
restricting hair or beard length in its own institutions"

15

(citing 28 C.F.R. §§ 551.2, 551.4)), appeal dismissed, No. 02-
5179, 2003 WL 1873847 (D.C. Cir. Apr. 11, 2003); see also
Dawinder S. Sidhu, Religious Freedom and Inmate Grooming
Standards, 66 U. Miami L. Rev. 923 (2012) (listing federal and
state inmate grooming policies in Appendix B).  Such facilities
would appear to have the same general interests regarding
escapes, gangs, contraband, security, and inmate safety, but do
not similarly limit beards.

When asked how facilities without beard length restrictions
manage the risks presented by inmates with long beards, both
Warden Gerry and Maj. Fouts indicated that they had not
investigated that issue.  See Testimony of Gerry (Feb. 20,
2015); Testimony of Fouts (Feb. 20, 2015) (stating that he had
been surprised to hear that other states allowed beards, and
could not speak to whether those states allowed medium security
inmates to have beards).  In the absence of record evidence
distinguishing state, federal, and county facilities in any
material way with respect to their design, administration,
prison population characteristics, or their interests in
avoiding the problems asserted by the NHSP as justifications for
its beard length policy, the evidence showing that other
facilities do not similarly regulate beard length suggests that
there are, in fact, less restrictive means of furthering each of

16

the NHSP's objectives.

### i.    Inmate Identification

This court next considers whether there are circumstances in Staples's case that make the NHSP's inmate identification interests compelling as applied to him.  See Yellowbear v. Lampert, 741 F.3d 48, 57 (10th Cir. 2014) ("compellingness" must not be evaluated "in the abstract").  In determining whether the interest at issue is compelling, the court must scrutinize whether the government's marginal interest in enforcing its regulation would be harmed if an exemption were granted that avoids substantially burdening the plaintiff's religious practice.  See Holt, 135 S. Ct. at 863.  A court may not accept at face value a prison official's assertion that a restriction "furthers" a compelling interest, without assessing whether the requested exemption to the restrictive regulation would seriously compromise that interest.  See id. at 863-64 (courts should not simply accept prison official's assertion that restriction "actually" furthers prison's interest in rooting out contraband, where that assertion does not appear plausible as applied in that case).

As to inmate identification, Maj. Fouts asserted in an affidavit that the beard length restriction promotes the NHSP's

interest in keeping inmates out of areas of the prison where they do not belong, and in preventing escaped inmates from eluding capture by swiftly changing their appearance. See Doc. No. 11-2, at 2-3 (Fouts Affidavit, Dec. 5, 2014). Fouts's hearing testimony did not adequately clarify for the court the particular problem of keeping inmates with beards that can be shaved out of restricted areas; Fouts did not explain for example, why other means employed by the prison such as door locks, searches, surveillance, color-coded uniforms, and the requirement that an inmate wear an ID card, cannot adequately prevent any inmate from trespassing into restricted areas within the prison walls. Cf. Doc. No. 11-1, at 16 (Manual for Guidance of Inmates) (inmate uniforms may vary in color depending on assigned living area; inmates must wear ID cards at all times with picture visible to all staff members whenever inmate is out of unit). This court cannot conclude from the evidence in the record that an asserted interest in keeping inmates from accessing unspecified restricted areas within the prison walls is compelling in this context.

With respect to the post-escape risks of disguise, Fouts testified on February 20, 2015, that prison officials have a compelling interest in facilitating the recapture of escapees, and that prison officials need to be able to respond swiftly

post-escape by releasing a reasonable facsimile of the inmate's
appearance to law enforcement for that purpose.  Fouts and
Warden Gerry testified that inmates with long beards can easily
frustrate those goals because a long beard may obscure an
inmate's face, and the inmate's latest prison photo or its
information about the inmate's most recent appearance, may not
match the myriad ways the escapee could alter his facial hair
after escaping.  See Testimony of Gerry (Feb. 20, 2015) (beard
obscures face); Testimony of Fouts (Feb. 20, 2015) (easy for
inmate to change beard style).  Fouts further testified that
prison officials could not take enough identification photos of
bearded inmates over time to match the range of facial hair
configurations a long-bearded inmate could devise after
escaping.

  This court does not question the prison officials'
testimony regarding a long-bearded inmate's ability, in the
abstract, to change his appearance if he shaved.  The evidence
shows, however, that the NHSP does not similarly restrict medium
security inmates from growing their hair long, however, and
hairstyle changes can also be used to quickly alter an inmate's
appearance.  There would be, for example, many ways that an
inmate with long hair could disguise himself after an escape by
cutting or dying his hair.  And any inmate, clean-shaven or not

before his escape, could make the rest of his face look different by wearing glasses or a scarf, a high collar, or a false mustache or beard.

Both Gerry and Fouts testified that one reason for the difference in the NHSP's regulation of hairstyles and beard length is that changes to hairstyles would not be as dramatic as changes to a full length beard, since a full length beard can obscure an inmate's facial contours. As applied to Staples, however, that explanation is not persuasive. The prison presently possesses two relatively recent photos of Staples, one with a full-length beard, taken by Maj. Fouts in December 2014, and one clean-shaven, which Fouts called an intake photo, and which Staples asserts was taken in 2009. See Doc. No. 2-1, at 16; see also Doc. No. 11-2 (Fouts Affidavit (Dec. 5, 2014), at 1); Defs.' Exs. A, B for Feb. 19, 2015, Evidentiary Hearing. The clean-shaven photo, Ex. B, plainly shows Staples's unbearded facial contours. Because the prison, in Staples's case, already possesses a photo exhibiting Staples's facial contours and a photo of him with a full beard, its stated concern for being unable to offer a photo to law enforcement that could be used to recapture Staples if he were to escape, shave, or otherwise trim his beard, is not a persuasive justification for treating hair and beard length differently in a manner that substantially

burdens Staples's religious practice.

Furthermore, there is no persuasive evidence from which
this court could conclude that Staples presents a heightened
escape risk.  Warden Gerry testified that he is aware of nothing
indicating Staples presents a heightened risk of escape.
Fouts's testimony, regarding Staples's bail jumping conviction
potentially making him more likely to risk escaping, appears to
have been an unfounded, post hoc rationalization, where Fouts
admitted he was unaware of the facts underlying Staples's
convictions.  In light of evidence showing that other prison
systems do not similarly restrict beard length, and given the
absence of evidence justifying the NHSP's more restrictive
policy as applied to Staples, this court concludes that
defendants have not shown that keeping Staples in SHU because of
his beard length is the least restrictive means of furthering a
compelling interest relating to inmate identification, in
Staples's case.

ii.  <u>Staunching Contraband Flows</u>

Maj. Fouts and Warden Gerry each testified in the
evidentiary hearing on Staples's preliminary injunction motion,
that long beards may be used to hide a range of contraband,
including small razors, bits of metal, handcuff keys, and drugs,
and that to further its interest in staunching contraband flows,

the NHSP does not allow inmates with long beards to be released into medium custody units.  Fouts cited Suboxone as a drug of particular concern, as it can be produced in the form of a thin wafer-like strip.  Fouts testified that inmates in the general population have devised means for bringing Suboxone into the prison and distributing the drug in a manner that prison officials have yet to counter effectively.  See Testimony of Fouts (Feb. 20, 2015).  Fouts also testified regarding aspects of Staples's disciplinary history, which indicate that Staples presents a heightened risk for contraband distribution, including Staples's history of having disposed of prescribed medication in an air vent, and his use of a razor blade for self-harm when he was in SHU, where razors are contraband.  See id.  Fouts further testified that even if Staples did not want to hide contraband in his beard, he could be targeted by inmates and coerced to do so, if he were released into the general prison population with a full length beard.  See id.

Fouts testified that inmates with long hair are allowed to live in medium custody units, because, in general, inmates with long hair can be subjected to searches that Fouts believes cannot be effectively implemented in Staples's case.  See id.  An inmate with long hair may be searched for contraband by ordering the inmate to bend over and shake out his hair.  See

id.  Fouts testified that head hair is generally smoother than beard hair and grows from the top of the head down, while a beard like Staples's is tightly curled and grows down from the face, that curly beard hair in general can retain objects better than head hair, and that a beard that grows down cannot be inverted and shaken out in the same way as head hair.  See id.

Fouts's explanation regarding why Staples's beard could not be searched effectively if he were in a medium custody unit does not persuade the court that beards present contraband distribution issues that are different than those presented by long hair.  Although this court observed Staples sticking a pen through his beard and keeping it there for a few moments while he moved his head, there is no evidence that Staples's beard hair could hold or conceal any item better than the hair on a long-haired inmate's head, if both inmates were to shake their heads, while bending over.

Furthermore, this court is not persuaded that comb searches would be impractical and ineffective to achieve the goal of staunching contraband flows.  Fine-toothed combs may be used to extract tiny things from places like beards, and detanglers and rich conditioning products may facilitate those searches.  Fouts expressed concern about who would be responsible for carrying the comb, see Testimony of Fouts (Feb. 20, 2015), but there is

no evidence suggesting that requiring Staples to carry a comb or
to have each officer carry a comb would seriously compromise any
compelling institutional interest in safety, security, or cost
control.  Fouts also mentioned in his testimony the possibility
of walking Staples through a metal detector, which suggests that
there may be another, less restrictive, means of searching
Staples's beard for at least some types of objects of concern.

Fouts testified of February 20, 2015, that the extra time
it would take a guard to comb or otherwise effectively search a
long beard in the medium custody unit, when other inmates may be
queued up for a search, could cause the inherent tension in such
situations to reach a flashpoint, and to erupt into violence
that the reduced staffing in a medium security unit could not
restrain.  While this court must defer to the expertise of
prison officials in matters relating to security, the proper
level of deference does not require unquestioning acceptance.
See Holt, 135 S. Ct. at 864.  Where Warden Gerry testified that
it might take no more than four seconds for Staples's beard to
be searched effectively, and Fouts also testified that prison
staff are trained in techniques to defuse tension in search
situations, this court is not persuaded that comb searches are
impracticable or that the time that might be required to perform
a thorough search of Staples's beard would seriously jeopardize

safety and security, if Staples were housed outside of SHU with
a full beard.  The evidence shows that SHU guards regularly
perform searches of Staples's beard; the evidence does not
persuasively show that Staples's beard cannot be subjected to
searches, by comb or otherwise, in medium security units at
approximately the same frequency and intensity that medium
security inmates' long hair is presently searched.  In light of
defendants' failure to show how other facilities manage similar
risks relating to contraband, without similarly restricting
beard length, defendants have not carried their burden of
showing that restricting Staples to SHU is the least restrictive
means of furthering its interest of staunching the flow of
contraband at the NHSP.

### iii. Gang Displays

Maj. Fouts testified on February 20, 2015, that the policy
of restricting the length of beards of inmates in general
population furthers the prison's interest in restricting inmate
gang displays.  He testified that prison officials have
determined that religious objects like prayer beads may show
gang affiliations in a manner that may not be readily apparent
to those who are not gang initiates.  See id.  There is no
evidence in the record, however, that a full, untrimmed beard
displays gang affiliation, that Staples's beard is a gang

marker, or that Staples presents a heightened risk of being a
prison gang member.  Furthermore, NHSP officials have not
explained why hair length is not restricted, while long beards
are prohibited, where there appears to be a similar risk that
long hair and long beards could display gang affiliation.

There is also no evidence suggesting that granting Staples
the exemption he requests would present a substantial risk of
harm to the prison's interest in inhibiting gang displays.
There was evidence regarding the frequency of guards taking
counts of inmates and conducting visual or pat-down searches of
inmates in their charge, indicating that they are likely to
become familiar with the appearance of inmates in their charge.
See Testimony of Fouts (Feb. 20, 2015); Testimony of Gerry (Feb.
20, 2015) (regarding frequency of counts and/or searches).
Moreover, if Staples were to trim, sculpt, or alter his long
beard in any way apparent to those who see him each day, prison
officials could swiftly respond by revisiting whether Staples's
beard length remains sincerely based on a religious belief.
Accordingly, defendants have failed to show that the restriction
on Staples's access to medium security housing with a full beard
is the least restrictive means of furthering an interest
relating to prison gangs.

iv.   Protection of Staples

In the February 20, 2015, evidentiary hearing, Maj. Fouts
testified that the prison has a safety and security interest in
protecting inmates from being targeted for abuse by other
inmates in the general population, and that the risk of harm is
greater if an inmate appears to have received special treatment
from prison officials.  Fouts testified that keeping Staples
confined in SHU furthers that goal, because his beard is longer
than that permitted for other inmates in the general population.
See Testimony of Fouts (Feb. 20, 2015).

Defendants have not shown that confining Staples to SHU is
the least restrictive means of achieving their objective of
keeping Staples safe from abuse.  The evidence shows that
inmates who have been granted religious exemptions from the NHSP
meal schedule, or who are permitted to possess medicine bags for
religious purposes, are not similarly confined in SHU.  Both
Warden Gerry and Maj. Fouts testified that inmates who have been
granted altered meal schedules and menus, or who are allowed to
possess medicine bags have not been targeted for abuse by
others.  Testimony of Gerry (Feb. 20, 2015); Testimony of Fouts
(Feb. 20, 2015).  The court is not persuaded that Staples's
beard would make him more of a lightning rod for abuse than the

27

medicine bag or altered meal schedules and menus of other inmates who have obtained accommodations from NHSP for their religious beliefs.

Moreover, protective custody is available for inmates who are victimized by other inmates.  Fouts's testimony indicates that inmates may be considered for protective custody even if they do not request it.  <u>See</u> Testimony of Fouts (Feb. 20, 2015). Defendants have not shown that releasing Staples into the general inmate population outside of SHU, with procedures in place for granting him protective custody and transferring him back or to a different unit as appropriate, would not achieve the NHSP's interests in adequately protecting Staples from targeted abuse.

In light of the evidence in the record at this stage of the case, the NHSP policy of confining Staples indefinitely in SHU until he shaves does not withstand Staples's RLUIPA challenge. Staples has demonstrated a substantial likelihood of success on the merits of his RLUIPA claims relating to each NHSP restriction imposed upon him.

### B.   <u>RLUIPA Claims Relating to Parole</u>

Staples contends that the APB violated his rights under RLUIPA by denying him parole on April 3, 2014, because of his C-4 status on that date, and by preventing him from obtaining

reconsideration for parole in the future unless he obtains C-3 status.  Ashlyn St. Germain, the APB counselor/case manager who took the minutes for Staples's parole hearing, appeared as a witness in this court.  St. Germain testified on February 19, 2015, that the APB denied parole to Staples on April 3, 2014, based on two factors:  his heightened security classification (C-4, at that time) and the lack of a solid parole/residence plan in his parole application.  This court's review of the recording of the April 3, 2014, hearing (Defs.' Ex. M for Feb. 19, 2015, Evidentiary Hearing), substantiates that Staples's C-4 status was a principal concern of the APB when it denied parole, and that the APB required Staples to remain free of disciplinary violations, to attain C-3 status, and to produce a solid housing plan, before it would again consider him for parole.

### 1.  Substantial Burden

A substantial burden may be established where the restriction at issue requires the plaintiff to "'engage in conduct that seriously violates [his] religious beliefs,'" or puts the plaintiff to the choice of either facing serious consequences or violating his beliefs.  See Holt, 135 S. Ct. at 862 (prison's policy that required inmate to shave his beard in violation of his beliefs, and made him choose between facing serious disciplinary action or shaving, substantially burdened

his religious exercise).

There is no dispute that Staples has been unable to obtain C-3 status from NHSP officials without shaving.  See Doc. No. 65.  While there was evidence that the April 3, 2014, parole denial was justified by at least one ground unrelated to Staples's religious practices (Staples's lack of a housing plan in his parole application, cf. Defs.' Ex. J for Feb. 19, 2015, Evidentiary Hearing (N.H. Code Admin. R. Par. 302.01(e))), there was also no dispute that the APB's denial of parole on April 3, 2014, was based, in part, on Staples's elevated classification. Both Andrea Goldberg, Executive Assistant to the APB, and Ashlyn St. Germain testified persuasively on February 19, 2015, that the APB, in general, denies discretionary parole to the community, inmates whose classification is higher than C-3, and that its decision in Staples's case was consistent with that policy and practice.  Furthermore, St. Germain testified that while the APB in the past has occasionally granted parole to inmates who have not put housing plans into their parole application, she explained that the APB has usually done so only after exploring the inmate's plans for housing through questions asked in the parole hearing, and that because of Staples's elevated security classification, the APB did not engage in a long discussion with Staples about his housing plans.  See

Testimony of St. Germain (Feb. 19, 2015).  This court's review
of the recording of the April 3, 2014, parole hearing does not
reveal any discussion of Staples's housing plan, and confirms
that Staples's classification was a key factor affecting the
APB's decision.  See Defs.' Ex. M to Feb. 19, 2015, Evidentiary
Hearing.  Staples has thus demonstrated that as applied to him,
the APB's policy of denying parole to any inmate whose
classification exceeds C-3 substantially burdened his religious
exercise.  Cf. Sherbert v. Verner, 374 U.S. 398, 406 (1963) ("to
condition the availability of benefits upon [plaintiff's]
willingness to violate a cardinal principle of her religious
faith effectively penalizes the free exercise of her
constitutional liberties").[3]

   Furthermore, the evidence showed that so long as the NHSP
ties Staples's beard length to his classification, the APB's
restriction on Staples's ability to obtain future parole
consideration causes Staples to lose the possibility of

---

   [3]Employing a balancing test resembling that required by
RLUIPA, the Sherbert Court invalidated state unemployment
compensation rules that conditioned the availability of benefits
upon an applicant's willingness to work under conditions
forbidden by his religion.  See 374 U.S. at 406.  The Supreme
Court in Employment Div. v. Smith, 494 U.S. 872 (1990),
abrogated Sherbert for the purposes of First Amendment claims
challenging neutral, generally applicable laws that incidentally
burden the exercise of religion.  RLUIPA expanded the protection
available for inmates' religious practices, after Smith.  See
generally Holt, 135 S. Ct. at 859-60.

obtaining a parole hearing for the years remaining in his
sentence, unless he violates his religious beliefs.  The
substantial burden test here is satisfied by evidence that
parole consideration remains completely out of Staples's reach,
regardless of his ability to develop a housing plan or to remain
free of disciplinary charges, unless in the interim, he succumbs
to pressure to shave his beard in violation of his religious
beliefs.  Accordingly, for the purposes of evaluating the
preliminary injunction motion, Staples has shown both that the
condition on his future ability to obtain parole and the
outright denial of his parole application on April 3, 2014,
substantially burdened his religious exercise.

      2.   Compelling Interest/Least Restrictive Means Test

     The burden of proof under RLUIPA shifts to defendants to
demonstrate that the APB's April 2014 parole denial and
requirement that Staples obtain C-3 classification before being
reconsidered for parole were the least restrictive means of
furthering a compelling governmental interest.  Defendants
assert that both requirements further the APB's interests in
ensuring that inmates, in general, are prepared for release to
the community and will not violate the law if released before
they have served the maximum term of their sentences.  See Doc.
No. 69, at 12-13 (citing N.H. Rev. Stat. Ann. § 651-A:6, I(a)

(prisoner may be released on parole if there shall appear to APB that there is "a reasonable probability that the prisoner will remain at liberty without violating the law and will conduct himself or herself as a good citizen")).

The evidence in the record indicates that the APB generally will not parole an inmate to the community if his security classification exceeds C-3.  Ashlyn St. Germain and Andrea Goldberg testified on February 19, 2015, regarding the APB's use of C-3 status, in general, as a marker of an inmate's readiness for parole.  Both witnesses testified that a C-3 (or lower) classification is important to the APB, because the classification generally reflects the inmate's ability to follow rules under supervision; a heightened security classification usually indicates that the inmate has had disciplinary problems. Goldberg further testified that there are studies showing a correlation between an inmate's good institutional behavior and good behavior on parole, and that the APB reasonably believes that a C-3 classification is one indicator of the inmate's probability of obeying the law and complying with parole conditions if granted discretionary parole to the community.

St. Germain and Goldberg further testified that an inmate's housing placement in a medium security unit, which is typically associated with a C-3 classification, may also be used by the

APB to predict the offender's probability of success on parole. Goldberg explained that there are less restrictions and less supervision in medium security units, and that good behavior under lesser degrees of supervision in prison is used by the APB to predict a parolee's likelihood of good behavior on parole, where there is still less supervision.

This court does not question St. Germain's and Goldberg's testimony regarding the APB's reasons for using C-3 status in general to assess an inmate's fitness for parole.  Defendants have failed to show, however, that the APB's policy of relying on classification in Staples's case is the least restrictive means available to it to achieve its objectives.  There are many factors that the APB may consider in assessing an inmate's fitness for parole, including the inmate's disciplinary record and successful completion of self-improvement programs.  See Doc. No. 11-1, at 50-51 (listing factors that may affect parole decision); Defs.' Ex. J for Feb. 19, 2015, Evidentiary Hearing (N.H. Code Admin. R., Par. 301.03).  Defendants have not shown that the APB could not effectively assess Staple's probability of recidivism or likelihood of good citizenship upon release by considering an array of factors unrelated to his beard length, including his disciplinary history, criminal history, behavior in SHU, any evidence of self-improvement that might exist, and

other markers of his conduct and attitude while incarcerated.

St. Germain further testified on February 19, 2015, that inmates with C-3 status who are housed in SHU, due to their protective custody status, lack of bed space, or other reasons beyond their control, have been granted parole to the community by the APB in the past.  Goldberg corroborated that testimony based on her own observations of the APB proceedings over time. The fact that the APB in the past has paroled C-3 inmates from SHU directly to the community further indicates that there may be less restrictive means of assessing Staples's fitness for parole, apart from relying primarily on factors that the NHSP has placed outside of Staples's control, unless he shaves in violation of his religious beliefs.  Accordingly, Staples has demonstrated a substantial likelihood of prevailing on the merits of his RLUIPA claim challenging the APB's April 3, 2014, denial of his parole application, and the APB's decision to condition his future ability to obtain parole consideration on his obtaining C-3 status, where abandonment of his religious practices has been, and continues to be, the only way Staples might obtain a C-3 classification.[4]

---

[4]The preliminary relief proposed in the conclusion of this Report and Recommendation, if granted, would remove Staples's religious practice of maintaining a beard as an obstacle to his ability to satisfy the APB's C-3 classification requirement, while this case is pending.

C.    Equal Protection Claims

Staples's claims asserting violations of his rights under the Equal Protection Clause allege that defendants treated him differently on the ground that he is engaging in a Taoist religious practice.  The Fourteenth Amendment's Equal Protection Clause requires states to treat similarly situated people in a similar manner.  City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985).  Generally, to establish an equal protection claim, a plaintiff must demonstrate that, (1) compared with others similarly situated, he was selectively treated, and (2) that the selective treatment was motivated by purposeful discrimination on some improper basis, such as plaintiff's membership in a particular race or religion.  See Hernandez v. New York, 500 U.S. 352, 360 (1991).  Proof of discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.  Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265 (1977).

The evidence presented to the court in connection with Staples's preliminary injunction motion does not show that Staples is likely to succeed on an equal protection claim challenging the NHSP restrictions.  It is undisputed that Staples's beard violates NHSP policy because of its length, and

36

that all inmates outside of SHU are required to conform to the beard length policy at the risk of being subjected to disciplinary proceedings for failing to do so.  The evidence regarding the heightened security procedures in place in SHU provide ample, legitimate reasons for treating SHU inmates differently than other inmates with respect to beard length. Staples's evidence regarding the classification decisions affecting him do not show that Kim Lacasse, any member of Staples's unit team, or any other prison official was motivated by religious or racial discrimination, or any other improper class-based criteria, when Staples's security level was elevated, or that Staples's race or religion, per se, has interfered with his ability to have his security classification downgraded.  Staples offered no evidence suggesting that he has been treated differently than any other inmates who have sought to grow beards to practice a different religion, or as to those who have sought to grow beards for secular reasons.  Staples has made no showing suggesting that any similarly-situated inmates have been treated differently with respect to their exposure to disciplinary charges for refusing to shave, with respect to classification decisions, or with respect to their confinement in SHU.

Staples has similarly failed to show a likelihood of

success on his claims challenging the APB's April 3, 2014,
decision on equal protection grounds.  This court credits the
testimony in the record that the APB does not generally parole
C-4 inmates to the community, and that heightened
classification, the inmate's housing circumstances, as well as
the inmate's disciplinary record may all be used by the APB to
predict the inmate's likelihood of successful reintegration into
the community.  APB members in Staples's case relied on facially
neutral standards and criteria (his C-4 security classification
and the lack of a housing plan in his parole application packet)
in denying Staples's parole request and in placing conditions
upon him for obtaining parole consideration in the future, and
there is no persuasive evidence showing that those criteria were
pretextual for any improper discriminatory motive.

The court has listened to the recordings of both the
December 2013 and April 2014 parole hearings at issue in this
case.  See Defs.' Ex. M for Feb. 19, 2015, Evidentiary Hearing.
Staples was treated differently by the APB in December 2013 and
in April 2014 because the circumstances were different:  the
December 2013 parole hearing concerned parole to a consecutive
prison term, while the April 2014 hearing concerned parole to
the community.  The APB members' questions on April 3, 2014,
about Staples's beard and religion appear to reflect the

skepticism of one or more APB members regarding the sincerity or immutability of Staples's religious beliefs, and the members' curiosity regarding those beliefs and his beard.  Without more, however, this court cannot find that the APB members' questions manifested any improperly discriminatory bias, or that the APB's April 3, 2014, decision violated Staples's rights to equal protection.  Accordingly, plaintiff has failed to show a likelihood of success on the merits of any equal protection claim at this stage of the case.

## II.  Irreparable Harm

Finding that Staples has showed a substantial likelihood of success on the merits of his RLUIPA claim challenging both the NHSP's restrictions and the APB's classification-based parole denial and restriction on Staples's ability to obtain future parole consideration, this court considers the remaining preliminary injunction factors, beginning with irreparable harm. "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." Charlesbank Equity Fund II, Ltd. P'ship v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004).  "Irreparable harm most often exists where a party has no adequate remedy at law."  Id.

The loss of religious freedom caused by a RLUIPA violation

is sufficient to show irreparable harm.  See Opulent Life Church
v. City of Holly Springs, 697 F.3d 279, 295 (5th Cir. 2012)
(citing Elrod v. Burns, 427 U.S. 347, 373 (1976) ("The loss of
First Amendment freedoms, for even minimal periods of time,
unquestionably constitutes irreparable injury.")); see also
Jolly v. Coughlin, 76 F.3d 468, 482 (2d Cir. 1996) (violation of
statutory right to avoid substantial burden on religious
exercise constituted irreparable harm).  Here, the record before
this court indicates that plaintiff is likely to succeed on the
merits of his RLUIPA claims challenging the NHSP restrictions
and APB conditions.  Staples has, to that extent, proven a
likelihood of irreparable harm.

     Furthermore, Staples has also shown that without a court
order, he will be ineligible for further parole consideration
for the three years that remain before he reaches his sentence
maximum.  Staples has testified, without contradiction, that
prison officials have told him that unless he shaves, he will
serve the rest of his years at NHSP in SHU, where almost all
hours of his days and nights are spent alone in an eight foot by
ten foot cell.  Staples has shown that without a court order, he
will continue to experience the severe deprivations of maximum
security confinement and the attendant loss of opportunities for
human interaction and rehabilitation that come with long-term

SHU placement.  Those harms are not conjectural, and cannot be effectively compensated at law.

## III. **Balance of Harms**

In terms of the balance of hardships, Staples has demonstrated that the balance tips towards issuance of the narrowly-tailored injunction set forth in the conclusion of this Report and Recommendation.  Staples has shown that corrections officers are presently trained to defuse the tension that may arise when searches are time consuming, and that procedures could be implemented to search his beard for contraband that resemble those already in place for inmates in medium security units whose long or dense, curly hair must be searched, and for inmates with long beards in SHU.  Staples has also shown that there are prison procedures in place for updating an inmate's identification photo, which may be implemented to track his beard length.  Furthermore, this court notes that Maj. Fouts testified on February 20, 2015, that there are management costs associated with keeping Staples in SHU; it stands to reason that some of those costs could be avoided or reallocated, if Staples were transferred to a lower security unit.

The narrowly-tailored injunction proposed below does not require Staples to be released on parole; the APB retains discretion to decide whether parole is appropriate in Staples's

case, based on factors unrelated to Staples's beard length.

Furthermore, NHSP officials retain discretion to decide whether

to lower Staples's classification or to release him from SHU

based on any factor other than his beard length.  And there are

already procedures in place at the NHSP for removing Staples

from the general prison population in the future if his

misconduct or protective custody issues warrant his return to a

higher classification or to SHU.  Accordingly, plaintiff has

demonstrated that the balance of harms tips in favor of granting

him preliminary injunctive relief, in the form set forth in the

conclusion of this Report and Recommendation.

## IV.    **Public Interest**

The public interest favors the issuance of a preliminary

injunction in this case.  Congress's enactment of RLUIPA

manifests that the public has an interest in ensuring that

inmates' individual religious practices are not substantially

burdened by government policies, if there are less restrictive

alternatives.

Moreover, it is undisputed that the public has an interest

in avoiding the release of inmates who are at an elevated risk

of recidivism.  Capt. Ronald Gagliardi testified before this

court, without contradiction, that research and experience shows

that inmates who serve the duration of their sentences in

maximum confinement without having had the opportunity to be
confined in lower custody levels are less likely to succeed in
their reintegration into the community; Goldberg's testimony
regarding the predictive value of using classification and
housing placement as measures of the inmate's probability of
good citizenship if paroled corroborates Gagliardi's testimony.
The proposed preliminary injunction set forth in the conclusion
of this Report and Recommendation, if issued, allows Staples to
work his way through the prison's classification and inmate
housing system, and to be reheard for parole consideration,
based on factors including his ability to conform to
institutional norms and rules that do not violate RLUIPA.
Allowing Staples to work his way through the system could thus
reduce the risk of Staples's recidivism upon his release, and
increase the prospects for his successful community re-
integration.  The public interest thus favors the type of
preliminary injunctive relief, proposed below.


### Conclusion

For reasons stated above, the district judge should approve
this Report and Recommendation, and should grant, in part, the
motion for a preliminary injunction relating to restrictions
placed upon Staples by the NHSP and the APB (doc. no. 1), by

issuing the following (proposed) Order:

    1.   The May 2015 Report and Recommendation on Plaintiff's preliminary injunction motion (doc. no. 1) is accepted and approved.  Plaintiff's motion for a preliminary injunction (doc. no. 1) is granted in part, to the extent consistent with that Report and Recommendation, and is otherwise denied.  The court specifically declines to order Staples's release from the NHSP at this time.

    2.   Defendants, for the duration of this lawsuit, are subject to the following prohibitions:

        A.   Defendants must not preclude Staples from obtaining a C-4 or C-3 security classification, based solely or in part, on his present or past refusal to trim his full length beard;

        B.   Defendants must not preclude Staples from being transferred to a C-3 or C-4 housing unit, based solely or in part, on his present or past refusal to trim his beard;

        C.   Defendants must not initiate new disciplinary proceedings against Staples, based solely or in part, on his present or past refusal to trim his beard; and

        D.   Defendants must not preclude Staples from being scheduled for a parole hearing, or from being paroled, based solely or in part on Staples's C-4 or C-5 security classification, unless the NHSP certifies that Staples's classification remains elevated for reasons other than his present or past refusal to trim his full length beard.

Any objections to this Report and Recommendation must be filed within fourteen days of receipt of this notice.  See Fed. R. Civ. P. 72(b)(2).  Failure to file objections within the specified time waives the right to appeal the district court's order.  See United States v. De Jesús-Viera, 655 F.3d 52, 57 (1st Cir. 2011); Sch. Union No. 37 v. United Nat'l Ins. Co., 617

F.3d 554, 564 (1st Cir. 2010).


Andrea K. Johnstone
United States Magistrate Judge


May 11 , 2015

cc:  Frank Staples, pro se
     Francis Charles Fredericks, Esq.
     Nancy J. Smith, Esq.