## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

Frank Staples

    v.

N.H. State Prison, Warden, et al.

Civil No. 14-cv-473-LM
Opinion No. 2015 DNH 132

### O R D E R

Pending before me are the parties' objections to the May 11, 2015 Report and Recommendation of Magistrate Judge Andrea K. Johnstone ("R&R") (doc. no. 86) granting, in large part, plaintiff Frank Staples's motion for a preliminary injunction (doc. no. 1). The defendants are the New Hampshire Parole Board and three named officials at the New Hampshire State Prison ("NHSP"): Warden Richard M. Gerry; Commissioner William Wrenn; and Chaplain James Daly.[1] Pursuant to Fed. R. Civ. P. 72(b)(3), I review the R&R de novo. See also 28 U.S.C. § 636(b)(1). I am free to "accept, reject, or modify the recommended disposition[,] to receive further evidence[,] or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3).

This case involves an inmate at the NHSP who wants, for religious reasons, to maintain a full-length beard while

---

[1] I refer to the defendants collectively as "defendants" or as the "the prison."

incarcerated.[2]  The prison allows inmates to grow a beard no longer than 1/4 inch.  The prison takes the position that an inmate, like Staples, with a beard longer than 1/4 inch, poses security risks and must therefore be housed in the maximum security unit of the prison known as the Special Housing Unit ("SHU") with a heightened security classification.  Before permitting a transfer to a housing unit with a lower security classification, the prison requires a bearded inmate to shave his beard to the required 1/4-inch length.  Staples refuses to shave his beard for religious reasons.  As a result, he alleges that he has suffered punitive consequences including a heightened security classification, discipline, and denial of parole.  Staples seeks a preliminary injunction to vindicate his religious right to grow a full-length beard without suffering any punitive consequences at the prison.

Following a two-day evidentiary hearing, the Magistrate Judge recommended that this court issue the following injunction:

> Defendants, for the duration of this lawsuit, are
> subject to the following prohibitions:
>
> A.   Defendants must not preclude Staples from
> obtaining a C-4 or C-3 security classification, based
> solely or in part, on his present or past refusal to
> trim his full length beard;

---

[2]The background facts are set forth in great detail in the R&R.

B. Defendants must not preclude Staples from being transferred to a C-3 or C-4 housing unit, based solely or in part, on his present or past refusal to trim his beard;

C. Defendants must not initiate new disciplinary proceedings against Staples, based solely or in part, on his present or past refusal to trim his beard; and

D. Defendants must not preclude Staples from being scheduled for a parole hearing, or from being paroled, based solely or in part on Staples's C-4 or C-5 security classification, unless the NHSP certifies that Staples's classification remains elevated for reasons other than his present or past refusal to trim his full length beard.

R&R (doc. no. 86) 44.

The Magistrate Judge further recommended that the court deny the motion for a preliminary injunction to the extent it asserts an equal protection claim, and to defer ruling on Staples's First Amendment claims because his claims under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc et seq., provide him with greater religious freedom protections.

Both plaintiff and defendants have filed objections to the R&R. See doc. nos. 90, 94, 98 and 104. Staples seeks a broader injunction; specifically, he seeks an immediate reduction in his security classification and immediate release from prison. After carefully considering Staples's objections (doc. nos. 94, 98 and 104), for the reasons stated in the R&R, I adopt the R&R

3

with respect to its denial of Staples's request for both an
immediate reduction in his security classification and immediate
release.

The defendants object to only one portion of the R&R and
otherwise agree to comply with the injunction during the
pendency of this lawsuit.  Specifically, the defendants object
to part B, the portion of the proposed injunction ordering them
to transfer Staples out of SHU and into a lower security unit
while he maintains a full-length beard.  The defendants' central
contention is that the R&R is not sufficiently deferential to
the prison's security-based justification for requiring an
inmate with a full-length beard to remain in SHU.

Having carefully reviewed the record and considered the
defendants' objection (doc. no. 90), I agree with the Magistrate
Judge's decision to issue part B of the injunction, although I
modify it to clarify that the prison may place Staples in a
housing unit known as a "Closed Custody Unit" ("CCU") while he
maintains his full-length beard.  I also modify the proposed
injunction to make clear that the prison has the right to house
Staples in SHU in the event that he uses his beard to conceal
contraband or becomes a target for abuse on the basis of his
full-length beard.  With those modifications, I find that the
injunction accords proper deference to the defendants' expertise

4

in running the prison while this lawsuit is pending.  See Holt
v. Hobbs, 135 S. Ct. 853, 864 (2015) ("Prison officials are
experts in running prisons and evaluating the likely effects of
altering prison rules, and courts should respect that
expertise."); Cutter v. Wilkinson, 544 U.S. 709, 723 (2005)
(upholding RLUIPA and noting that Congress anticipated that
courts would apply it with "due deference to the experience and
expertise of prison and jail administrators in establishing
necessary regulations and procedures to maintain good order,
security and discipline") (citation omitted).

### Legal Discussion

In Holt, a decision issued shortly before the evidentiary
hearing in this case, the Supreme Court struck down a prison's
grooming regulation under RLUIPA. 135 S. Ct. at 867.  The
regulation at issue in Holt required an inmate to be clean-
shaven unless the inmate had a skin condition, under which
circumstances the regulation permitted a 1/4-inch beard.  Id. at
865.  Although the inmate in Holt wanted a full-length beard for
religious reasons, he proposed as a compromise that the prison
allow him a 1/2-inch beard.  The prison refused to accept the
proposed compromise and defended its refusal on grounds of
prison security, including a concern that an inmate with a 1/2-
inch beard presented greater risks of concealing contraband in

5

his beard than did an inmate with a 1/4-inch beard.  Id. at 861.
Because the prison in Holt "failed to establish . . . that a
1/4-inch difference in beard length pose[d] a meaningful
increase in security risk," id. at 866, the prison's security-
based justification for refusing to permit a 1/2-inch beard
received no deference.  See id. at 863 ("We readily agree that
[the prison] has a compelling interest in staunching the flow of
contraband into and within its facilities, but the argument that
this interest would be seriously compromised by allowing an
inmate to grow a 1/2-inch beard is hard to take seriously.").

RLUIPA provides, in relevant part, that the government
shall not "impose a substantial burden on the religious exercise
of a person residing in or confined to an institution . . .
unless the government demonstrates that imposition of the burden
on that person — (1) is in furtherance of a compelling
governmental interest; and (2) is the least restrictive means of
furthering that compelling governmental interest."  42 U.S.C. §
2000cc-1(a).  Holt makes clear that, in assessing whether a
prison's security-based regulation is the "least restrictive"
means of addressing a security interest,[3] courts must take care

---

[3] The R&R correctly states the two-pronged test under
RLUIPA.  Because the dispute between the parties concerns only
RLUIPA's second prong, my discussion is limited to an analysis
of the "least restrictive" test.

to scrutinize the prison's stated security interest in the context of the individual inmate's specific circumstances and must not defer blindly to the prison's stated security justification for the particular regulation in dispute. 135 S. Ct. at 864. Holt reiterates that, under the second prong of the RLUIPA test, the "least-restrictive-means standard is exceptionally demanding, and it requires the government to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party." 135 S. Ct. at 864 (internal quotation marks and brackets omitted).

Holt cautions, however, that where a prison provides security-based justifications for its regulation, courts should afford a measure of deference and should not substitute their own judgment for that of the prison. Indeed, Justice Sotomayor wrote a concurrence to make precisely this point:

> Nothing in the Court's opinion calls into question our prior holding in Cutter v. Wilkerson that "context matters" in the application of [RLUIPA] . . . . In the dangerous prison environment, "regulations and procedures" are needed to "maintain good order, security and discipline. . . .
>
> I do not understand the Court's opinion to preclude deferring to prison officials' reasoning when that deference is due—that is, when prison officials offer a plausible explanation for their chosen policy that is supported by whatever evidence is reasonably available to them. But the deference that must be extended to the experience and expertise of prison

7

administrators does not extend so far that prison
officials may declare a compelling governmental
interest by fiat.

Holt, 135 S. Ct. at 867 (Sotomayor, J., concurring) (quoting

Cutter, 544 U.S. at 723) (other internal quotation marks and

brackets omitted).

In their objection, defendants' primary challenge is to the

Magistrate Judge's refusal to credit and defer to the prison's

security concerns that: (1) Staples could conceal contraband in

his full-length beard; and (2) Staples's full-length beard makes

him a highly visible target for abuse by other inmates.[4]  The

defendants assert that they can reduce these security risks to

an acceptable level only in SHU, where the ratio of corrections

officers to inmates is much higher than in the medium-security

units (where it can be as low as three officers to 288 inmates).

To determine whether defendants have satisfied their burden

under the second prong of RLUIPA, i.e., to show that SHU is the

"least-restrictive" unit in which to house Staples while he

maintains his full-length beard, the court must be mindful that

"context matters."  Holt, 135 S. Ct. at 867 (Sotomayor, J.,

concurring) (quoting Cutter, 544 U.S. at 723).  The context here

---

[4] At the hearing before the Magistrate Judge, the defendants
argued that an inmate with a full-length beard is too great a
security risk for reasons having to do with inmate
identification and prison gang displays.  The defendants have
wisely decided not to press those arguments in their objection.

is a "dangerous prison environment [where] regulations and procedures are needed to maintain good order, security and discipline . . . ."  Id. (internal quotation marks omitted).

Here, unlike Holt, the regulation at issue does not require that the inmate shave his beard.  Rather, the prison will permit Staples to grow his beard indefinitely.  The prison requires, however, that while Staples maintains his full-length beard, he must reside in SHU, the most secure unit, rather than in CCU or a medium-security housing unit.

In the analysis below, I begin by summarizing the differences between the three housing options (SHU, CCU and medium-security) available to the prison.  Next, I analyze the security concerns articulated by the prison.  Finally, I evaluate whether those security concerns meet the defendants' "exceptionally demanding" burden under RLUIPA, Holt, 135 S. Ct. at 864, to demonstrate that placing Staples in SHU is the least-restrictive means of addressing its security interests.  Like the Magistrate Judge, I conclude that the prison has not, at this stage of the litigation, satisfied its burden.

    1.  There are three housing options at issue: SHU, CCU, and a medium-custody unit.

To decide whether placement in SHU is the "least-restrictive" of the three available housing options, it is

necessary to understand the differences between the options.
The prison houses each inmate based on his security
classification.  The prison classifies inmates by assessing
their background, need for close supervision, and overall
dangerousness.  An inmate's classification is not a static
assessment; rather, it can fluctuate depending on his behavior
while incarcerated.  For purposes of this case, there are three
relevant classifications.  Listed in descending order of
perceived dangerousness, the relevant classifications are C-5,
C-4, and C-3.

Once classified, an inmate is assigned to a particular
housing unit at the prison.  There are multiple housing units
but, like the security classifications, only three are relevant
in this case.  Listed in order of most to least restrictive, the
relevant units are: (1) SHU (for inmates classified as C-5); (2)
the "closed custody unit" or "CCU" (for inmates classified as C-
4); and (3) the medium-security units, also referred to as the
units housing "the general population" (for inmates classified
as C-3).

In SHU, the prison exercises the highest level of
supervision and control over inmates.  Inmates are held in
single cells and are allowed out of their cells only for limited
reasons (e.g., attorney visits, medical appointments, and

exercise).   In SHU, the prison allows no socializing among
inmates.   Prior to being transported out of his cell to a
different area such as the exercise yard, an inmate is
handcuffed and physically escorted by a corrections officer.
Once the inmate reaches his destination, the handcuffs are
removed.   When the inmate completes his time at his destination,
he is handcuffed and escorted back to his cell.   The prison
refers to this as "single movement" because the inmates are
transported only one at a time.   SHU is also described as a
"single cell" unit because inmates are alone in a cell and eat
their meals alone in their cells.   Warden Gerry described SHU as
a "very labor-intensive area, [in which] the staff wear[]
protective vests . . . for their safety and security."   Hr'g
Tr., Feb. 20, 2015 (doc. no. 99) 47:25 - 48:3.

Compared to SHU, CCU allows for increased socialization and
movement.   CCU has three tiers with 40 inmates on each tier.
The inmates are allowed out of their cells in groups of 20
inmates at a time, three times per day: morning, afternoon and
evening.   As Warden Gerry explained, CCU offers inmates "an
opportunity . . . [for] showering, using the telephone, and
recreating within that unit.   They would also be going to the
dining halls and they would move as a group. . . . There's a lot
more interaction with other inmates and more out-of-cell time

than there is in SHU."  Hr'g Tr., Feb. 20, 2015 (doc. no. 99) 48:24 - 49:5.

Compared to the inmates in SHU and CCU, the inmates in the medium-security units have much more freedom of movement and less supervision.  In a typical medium-security unit, there are 288 inmates.  They can have significant out-of-cell time and are able to interact with all the other 288 inmates in that unit. They have far less supervision; the ratio of corrections officers to inmates is approximately three to 288.  They are allowed to move around the prison in groups and with less supervision, going from their units to the dining hall, their jobs, the gym, the outdoor recreational area, and to other areas of the prison.  See Hr'g Tr., Feb. 20, 2015 (doc. no. 99) 49:8 - 50:2.

The classification of an inmate as C-5, C-4, or C-3 is not a perfect correlation for their being placed in SHU, CCU, or a medium-security unit.  The record reveals that inmates classified as C-5, and therefore in need of the highest level of supervision, reside only in SHU.  However, it is undisputed that the prison may place a C-3 or C-4 inmate in SHU for reasons unrelated to the inmate's security classification.  For example, SHU can serve as a temporary holding place for a C-3 or C-4 inmate while the prison resolves issues pertaining to that

inmate.  However, there are a limited number of beds in SHU, and the prison prefers to reserve those beds for the inmates most in need of close supervision.

While there is testimony in the record about the differences between these three levels of housing, the evidence at the hearing before the Magistrate Judge focused on the different security risks only as between SHU and the medium-security units.  What follows is brief discussion of the security risks articulated by the prison.

   2. Defendants' security concerns regarding contraband and
      Staples's safety.

The defendants argue that the placement of Staples in SHU while he maintains his full-length beard is the least restrictive of the available options on the basis of both a concern about contraband concealment and distribution, and a concern for Staples's safety.  The prison's contraband-related security concerns can be summarized as follows:

- Staples's full-length beard is thick and capable of concealing contraband;

- the prison deems Staples to pose a heightened risk of concealing and transporting contraband based on his disciplinary history; and

- the higher ratio of corrections officers to inmates in SHU will permit adequate monitoring of Staples's beard.

In the context of a medium-security housing unit, the
defendants' security concerns are entitled to significantly more
deference that those articulated by the prison in <u>Holt</u>.  Unlike
the situation in <u>Holt</u>, where the prison asserted but could not
explain how a 1/2-inch beard presented greater contraband-
related security risks than a 1/4-inch beard, the defendants'
security interests here concern the difference between a 1/4-
inch beard and a full-length beard.  Unlike <u>Holt</u>, where the
Magistrate Judge observed the inmate's beard and found it
"almost preposterous to think that [the inmate] could hide
contraband" in his short beard, 135 S. Ct. at 861, the
Magistrate Judge here "observed Staples sticking a pen through
his beard and keeping it there for a few moments while he moved
his head . . . ."  R&R (doc. no. 86) at 23.  Thus, the
undisputed evidence in the record supports the defendants'
concerns that Staples would be able to hide contraband in it.

Moreover, the prison's contraband concerns are tethered to
current conditions at NHSP.  One particular worrisome form of
contraband is Suboxone, a drug that can be produced in the form
of a thin, wafer-like strip.  A prison official testified that
inmates have devised means for bringing Suboxone into the prison
and distributing it in a manner that prison officials not been
able to counter effectively.  R&R (doc. no. 86) at 22.  The

prison is also concerned about the concealing of small metal objects such as razor blades.  It is undisputed that Staples's beard could conceal these types of items.

Importantly, the record reveals that the prison's contraband-related security concerns are not abstract and generalized, but are tied to Staples's background and disciplinary history.  During the hearing, a prison official testified about Staples's disciplinary history in the prison. According to the prison, Staples presents a heightened risk of contraband concealment and distribution based on the fact that Staples has a drug-related conviction and has a lengthy disciplinary history at the prison.  That disciplinary history includes an incident where Staples, while housed in SHU, used a razor blade for self-harm, despite knowing that razor blades are considered contraband in SHU, and an incident in which Staples concealed prescribed medication in violation of prison rules. R&R (doc. no. 86) at 22.

The prison witnesses explained the rigorous search procedures employed at the prison to prevent the concealment of contraband, and the fact that regular searches of a thick, coarse, full-length beard would require the kind of hands-on and invasive interaction with inmates that the prison attempts to minimize.  The prison officials testified that, as a general

rule, the more invasive and frequent the search, the greater the risk that inmates subjected to such searches will become agitated and aggressive in response.  Where the ratio of corrections officers to inmates in a medium-security unit is low (by comparison to SHU where it is one-on-one), the prison deems SHU a safer environment in which to house an inmate with a full-length beard.

The record establishes that inmates are allowed to grow the hair on their heads to whatever length they desire, regardless of security classification or housing assignment.  On its face, this policy cuts against the prison's contraband-related security justifications for keeping Staples in SHU.  Prison officials testified, however, that an inmate with long head hair is able to lean over, shake his head and hair, and run his fingers through his own hair to enable an effective search. With a full-length beard like Staples's, however, prison officials explained that an effective search of such a beard would require the corrections officer to conduct a hands-on, more invasive search of the beard.  In response to a question about how the prison handles an inmate with thick hair and with a texture more like that of Staples's beard, a prison official testified that he was not aware of a single inmate in the prison who currently meets that description.  Hr'g Tr., Feb. 20, 2015

(doc. no. 99) 176:21 - 177:12.  However, if an inmate had a head
of hair that presented security concerns similar to those
presented by Staples's beard, the prison would address it with
that inmate, and if necessary, issue directives to the inmate to
cut his hair.  See id. at 177:8 - 178:2.

In addition to concerns about contraband, the prison
articulated concerns about Staples's safety were he to be housed
in a medium-security unit with his full-length beard.  In short,
the prison argued that permitting Staples to transfer into a
medium-security unit with his full-length beard would make him
an immediate and visible target for abuse.  This is especially
the case because, according to the testimony, Staples would be
the sole inmate in the medium security population with a full-
length beard.  Major Fouts, who is chief of security at the
prison and who has worked for the New Hampshire Department of
Corrections for 25 years, was emphatic that housing Staples in a
medium-security unit would cause him harm:

> [I]f we were [to place Staples in a medium-
> security unit], that would scare the heck out of
> me for his own safety.
>
> I know inmates.  If he was the only inmate out of
> 1500 that sported a beard like that [in general
> population] . . . there's absolutely no doubt in
> my mind that he would be targeted.
>
> . . .

```
He would be targeted any way an inmate knows how
to target another inmate.
```

Hr'g Tr., Feb. 20, 2015 (doc. no. 99) 134:3 - 135:2.

In sum, the defendants' security justifications for keeping Staples in SHU while he maintains his full-length beard are related to contraband concealment and Staples's personal safety. The question remains whether those justifications are sufficient to meet the defendants' "exceptionally demanding" burden, Holt, 135 S. Ct. at 864, to show that placement in SHU is the least restrictive solution.

### 3. SHU is not the least restrictive of the available options.

To determine whether something is the least restrictive alternative, a court must first understand the comparators. That is, a court must answer the narrower question: "Least restrictive as to what?"  Here, the record reveals that the comparators to SHU are CCU and a medium-security unit.  The defendants' evidence at the hearing before the Magistrate Judge consisted entirely of testimony about why a fully-bearded Staples had to remain in SHU rather than a medium-security unit. The defendants offered almost no evidence that CCU is an inappropriate placement for Staples.

In CCU, as compared to a medium-security unit, inmates are more closely supervised, fewer in number, and have less freedom

of movement.  The smaller numbers of inmates and closer
supervision in CCU considerably mitigate the heightened concerns
about searching for contraband and inmate safety that prison
officials described.  There is no indication in the record that
the prison would be unable to closely monitor the contraband
concerns and mitigate the risks to Staples's safety were Staples
permitted to reside in CCU.  Indeed, Major Fouts's emphatic
expressions of concern for Staples's safety were in response to
a question about housing Staples in a medium-security (C-3)
unit.  Hr'g Tr., Feb. 20, 2015 (doc. no. 99) 133:12-14.

 When asked why CCU is not an appropriate alternative to
SHU, Major Fouts provided the following testimony:

> There's no difference really.  It's easy for
> somebody who doesn't understand the prison to
> visualize CCU as just one little minor step down
> from the Special Housing Unit, SHU.  The reality
> is that that's not an accurate comparison.
> Special Housing Unit is the only housing scenario
> that we have to me that mitigates . . . all the
> concerns we've talked about.
>
> CCU from the perspective that we're talking about
> relative to his beard is far more comparable to
> general population.  Remember that everyone has a
> roommate.  There's open movement periods.  These
> people leave the unit to go to chow or meals,
> feeds as we call it.  They go off to medical
> appointments, they go to mental health
> appointments, they actually move.  It's more
> restrictive more from a progression perspective
> than it is an actual movement perspective.  So

again, [SHU] is all that we offer that I think
mitigates the concerns of the beard.

Hr'g Tr., Feb. 20, 2015 (doc. no. 99) 136:25 - 137:17.

Major Fouts's testimony is the only evidence offered by the
prison to explain why CCU is not sufficient to address the
contraband and safety concerns the prison has articulated.[5]
Major Fouts's description of CCU as being "far more comparable
to general population" confirms the fact that CCU is less
restrictive than SHU.

However, his testimony that CCU is akin to a medium-
security housing unit in terms of monitoring the prison's
security concerns is difficult to square with the undisputed
evidence about the two housing units.  A medium-security unit
houses 288 inmates, and each inmate is permitted freedom of
movement from location to location within the unit.  Staples's
ability to conceal contraband (such as a strip of Suboxone) in
his beard, and go undetected as he transfers contraband from his
beard to one of the other 288 inmates, appears to me to be a
real possibility.  This is especially the case where there are
as few as three corrections officers supervising the 288
inmates.  In CCU, by comparison, the inmates reside in units of

---

[5] Indeed, on June 29, 2015, the court held a brief telephone
conference to explore this topic.  Counsel for the defendants
reiterated that CCU was similar to a medium-security unit for
purposes of the prison's security concerns.

40.  They move in groups of 20 inmates and are closely supervised by the corrections officers.  The level of supervision and smaller numbers of inmates in CCU would make it far easier for the prison to monitor Staples's use of his beard to hide and transport contraband.  Additionally, the smaller number of inmates in CCU would increase the prison's ability to monitor and protect Staples in the event any inmates (in the group of 20 with whom he is allowed contact) target him for abuse.  To the extent that the prison has declared SHU, as opposed to CCU, the least-restrictive housing option to address its security concerns, it has done so "by fiat."  Holt, 135 S. Ct. at 867 (Sotomayor, J., concurring).  RLUIPA requires much more.  Id. at 864.

Having reviewed the record and carefully considered the defendants' objection to the R&R, I agree with the Magistrate Judge's conclusion that defendants have not met their burden under RLUIPA to show that the least-restrictive means of addressing the contraband and safety issues is for Staples to remain in SHU while he maintains a full-length beard.  The record reveals that the prison could house Staples in CCU, which, because of its smaller size and closer supervision of inmates, would enable the prison to monitor Staples's conduct and his safety while he maintains his full-length beard.

The only portion of the proposed injunction to which defendants object is paragraph B.  Specifically, the defendants object to being ordered to house Staples in a medium-security unit.  Paragraph B does not, however, require that the prison house Staples in a medium-security housing unit.  Rather, paragraph B permits the prison to decide whether to house Staples in CCU (a C-4 unit) or in a medium-security (C-3) unit.  That is, paragraph B permits defendants to house Staples in CCU, even if he obtains a lower (C-3) security classification.  I have modified the language of paragraph B of the proposed injunction to clarify this for the defendants.

Additionally, because there may be scenarios where Staples's full-length beard could present security concerns, the prison must have the right and freedom to respond to such concerns.  Holt, 135 S. Ct. at 866-67 (RLUIPA "affords prison officials ample ability to maintain security" . . . and prison officials are "entitled to withdraw an accommodation if the claimant abuses the exemption in a manner that undermines the prison's compelling interests").  For example, were Staples to use his beard to conceal contraband, the prison must be permitted, in its discretion, to upgrade his security classification to C-5 and to move him to SHU.  Staples himself does not disagree with this principle; indeed, in his objection

22

(doc. no. 104), he proposes it as a condition of the injunction. Accordingly, I have further modified the proposed injunction to add paragraph E, to clarify that the prison maintains the right, during the pendency of this litigation, to take punitive or protective action in response to an actual security threat.

Other than these two modifications, I leave undisturbed the Magistrate Judge's proposed injunction.

### Conclusion

Having reviewed the entire record, I accept and approve the Report and Recommendation of Magistrate Judge Andrea K. Johnstone dated May 11, 2015 (doc. no. 86), and modify the proposed injunction in two ways: (1) by editing paragraph B to clarify that the prison may house Staples in CCU (a C-4 unit) in the event he obtains a C-3 classification; and (2) by adding paragraph E to clarify the prison's right to take punitive or protective actions in the face of actual security risks. Accordingly, plaintiff's motion for a preliminary injunction (doc. no. 1) is granted in part, to the extent consistent with the Report and Recommendation and this Order, and is otherwise denied.  The court specifically declines to order Staples's release from the NHSP at this time.  Defendants, for the duration of this lawsuit, are subject to the following injunction:

A. Defendants must not preclude Staples from obtaining a C-4 or C-3 security classification, based solely or in part, on his present or past refusal to trim his full-length beard;

B. In the event Staples obtains a C-4 or C-3 security classification pursuant to paragraph A, defendants must not preclude Staples from being transferred out of SHU and into CCU or a medium security unit based solely or in part on his present or past refusal to trim his beard, but defendants are permitted to house Staples in CCU in the event he obtains a C-3 security classification pursuant to paragraph A;

C. Defendants must not initiate new disciplinary proceedings against Staples, based solely or in part, on his present or past refusal to trim his beard;

D. Defendants must not preclude Staples from being scheduled for a parole hearing, or from being paroled, based solely or in part on Staples's C-4 or C-5 security classification, unless the NHSP certifies that Staples's classification remains elevated for reasons other than his present or past refusal to trim his full-length beard; and

E. Notwithstanding paragraphs A-D above, defendants may return Staples to SHU and assign him an appropriate security classification should he use his beard in any way to conceal, or attempt to conceal contraband. Further, defendants may place Staples in protective custody should they obtain demonstrable evidence that Staples has been the subject of any abuse, assault, or harassment in connection with his full-length beard.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

July 2, 2015

24

cc:     Frank Staples, pro se
        Francis Charles Fredericks, Esq.
        Lynmarie C. Cusack, Esq.